240 So.2d 104 (1970)
Mrs. Gloria GUILBEAU, for Herself and as Natural Tutrix of the Minors Van Guilbeau and Wanda Guilbeau, Edward Guilbeau, Kenneth Guilbeau, Mrs. Aloma G. Brunet, and Mrs. Betty Guilbeau
v.
Charles CALZADA.
No. 4018.
Court of Appeal of Louisiana, Fourth Circuit.
October 5, 1970.
Rehearing Denied November 2, 1970.
*105 Robert I. Broussard, Gretna, and Hugh G. Oliver, Westwego, for plaintiffs-appellants.
Campoy, Hurley & Senter, Joe L. Horne, New Orleans, for defendant-appellee.
Before REDMANN, BARNETTE and SWIFT, JJ.
SWIFT, Judge.
This suit arose from a collision of two motorboats which occurred around 5:00 P.M. on May 19, 1968, on Bayou Segnette, near Westwego, Louisiana.
*106 Andrew Eddie Guilbeau, Sr., owner and operator of one of the boats, lost his life by drowning as a consequence of the accident. His widow, Gloria Guilbeau, and their six children have sued for damages resulting from his death. Mrs. Guilbeau, two of her children and her daughter-in-law, who were passengers in the boat, also seek to recover damages for their own personal injuries.
Following a trial on the merits, the trial judge concluded that both boat operators were guilty of negligence and denied recovery in the death action. However, in the personal injury actions judgments were awarded the plaintiffs in the following amounts: $606.10 to Gloria Guilbeau; $250.00 to Gloria Guilbeau as natural tutrix of Van Guilbeau; $358.75 to Betty Broussard Guilbeau; and $756.50 to Kenneth Guilbeau. The reconventional demand of Charles Calzada was dismissed.
From this judgment plaintiffs have appealed, assigning as the principal error the trial judge's conclusion that Andrew Guilbeau was guilty of negligence that was a proximate cause of the accident. The defendant has answered the appeal.
Involved in the collision were a 22-foot fiberglass boat powered by a 155 horsepower Buick marine engine, owned and operated by Charles Calzada, that was moving down the bayou away from Westwego, and a 17-foot "Lafitte Skiff" powered by a Ford automobile engine, owned and operated by decedent, Andrew Guilbeau, Sr., which was travelling toward Westwego. The record shows that Calzada had purchased the boat in April, 1968, from North American Boat Corporation and had operated it in the area of the accident only a few times. He was an experienced boatman, however, and was fully familiar with this general area. Andrew Guilbeau constructed his boat with the help of a friend, and the first occasion he used it was on the day of the accident.
Passengers in the Guilbeau boat at the time of the collision were: Mrs. Gloria Guilbeau, Van Guilbeau, Kenneth Guilbeau and the latter's wife, Betty Broussard Guilbeau.
Charles Calzada was accompanied by Donald Calzada, his brother, their two sons, Joseph Calzada, his father, and Ivy Ehret, a brother-in-law.
Bayou Segnette is a narrow, winding channel connecting the boat launch at Westwego with Lake Cataouatche. Photographs offered in evidence disclose that the channel makes practically a 90 degree turn at the place where the accident occurred called "Yankee Camp." Trees and foliage obstruct the view so that approaching boatmen cannot see around the bend, which turns to the left in the direction the Calzada boat was moving.
Of the Guilbeau passengers only Kenneth Guilbeau was able to testify with any degree of specificity with regard to the manner of the accident's occurrence. He said that prior to the collision his father operated the boat on the right side of the channel and moved generally in the direction of Westwego. He further testified he observed the defendant's boat approaching in the middle of the channel and swerving toward the east bank just prior to the accident. The other boat was only about 20 or 25 feet away when he first saw it.
William Nealy, 75 years of age, was called as a witness by plaintiffs. He was trying to start the outboard motor on his boat about 15 or 20 feet from the west bank of the waterway and almost directly across from where the collision occurred. Nealy testified he heard the noise of defendant's engine before he saw the boat. Shortly before the impact the defendant was travelling in the middle of the waterway at an estimated speed of about 25 or 30 miles per hour. According to Nealy, defendant veered sharply to the left on seeing the approaching Guilbeau boat. He said Guilbeau made no sudden turns before impact, but rather travelled in a straight path about 30 feet from the east bank at a speed from five to seven miles per hour. Nealy saw *107 only the boats involved in the collision, and that of his brother-in-law, C. J. Fontenot, located at the edge of a dredged area of the east bank of the channel. He did not see any boat following the Lafitte skiff.
C. J. Fontenot, brother-in-law of Mr. Nealy, testified he began fishing near the west bank of Bayou Segnette, but later moved his boat to a cut or dredged area in the east bank of the bayou. Shortly after arriving in the cut Fontenot noticed Nealy having difficulty starting his outboard motor, and started to return to the west bank to assist him when he heard the noise of the approaching boats. Defendant approached Fontenot from the right, travelling in the middle of the waterway at a high rate of speed. Fontenot related that the Guilbeau boat approached from his left, travelling near the east bank of the waterway at a speed of about five to ten miles per hour. Calzada, according to Fontenot, made a sharp turn toward the east bank, crossing the path travelled by Guilbeau, who did not change his speed or direction of travel prior to the accident.
Carl Jervis who was called as a witness for defendant, testified that he followed approximately one-half block to 300 feet behind the Guilbeau boat for about five or ten minutes at a speed of about 30 miles per hour. He was aware of the speed because the boat he was operating was equipped with a rather accurate speedometer. However, he said they gained a "little bit, gradually" on the Lafitte skiff. Both boats were about in the middle, or slightly to the right, of the channel. According to this witness' version of the accident, defendant came around the turn about in the middle of the waterway, but on seeing the approaching boat, reduced his speed and made a controlled left turn toward the east bank. Guilbeau also turned toward the east bank, but only after Calzada had already begun his turn. The boats collided near the channel's east bank.
Jervis' account of the accident was corroborated in most respects by Mr. and Mrs. Melvin Odenwald, his brother-in-law and sister, who accompanied him in the boat.
Charles Calzada testified that he had attended the Lafitte Pirogue races on the morning of May 19, 1968, and on arriving at Westwego met his father and brother-in-law whom he offered to carry to a fishing camp. Approaching the site of the accident, Calzada operated his boat generally in the center of the channel at a speed of about 20 miles per hour. On entering the 90 degree turn he said he was confronted with what appeared to be four oncoming boats, each travelling abreast of the other. In an attempt to avoid the imminent collision, Calzada moved the gear shift to a neutral position and swerved toward the east bank. The Guilbeau boat turned a hard right, and the impact occurred immediately thereafter. Calzada contended that the accident would not have happened if the other boat had gone straight. He placed the point of impact near the center of the waterway.
Although they did not observe all particulars, the other three adults on the Calzada boat generally confirmed his testimony as to the manner in which the accident occurred.
It is clear from the record and undisputed by the parties that Bayou Segnette is navigable in fact. Since the collision of the two boats occurred on navigable waters of the United States, the dispute is cognizable in admiralty and the state courts have concurrent jurisdiction with the federal district courts. Rojas v. Robin, 230 La. 1096, 90 So.2d 58 (1956); Beavers v. Butler, 188 So.2d 725 (La.App. 2 Cir. 1966). And as the court said in the latter case, "When a maritime matter is pending in a state court, that court is required to follow the substantial maritime law, supplemented by state law if no contradiction appears." (Page 728).
The facts of the present case with respect to the collision and its cause are quite analogous to those involved in Beavers. Like the Court of Appeal, Second *108 Circuit, we are convinced that under such circumstances if either boat operator had been alert and keeping a proper lookout, or had been proceeding at a reasonable speed, the accident could have been avoided, and that both of the operators were guilty of negligence that proximately caused the collision under federal maritime law as well as the state law.
Although the evidence is conflicting, the preponderance thereof has convinced us that both boats were travelling in the neighborhood from 20 to 30 miles per hour as they approached the 90 degree bend in the channel. Despite the fact that foliage obstructed their view, both Guilbeau and Calzada proceeded at full speed, without regard for unseen boats around the turn. Both boats were travelling about in the middle of the channel, and when they came into view of each of the operators the boats were in close proximity. Defendant immediately turned his boat sharply toward the east bank and reduced its speed. A moment or so later Guilbeau turned his boat toward the east bank, striking the starboard side of the Calzada boat with the front and to some extent the port side of the Guilbeau boat.
Neither operator appears to have kept to his right side of the channel as required by Article 25 of the federal navigation rules applicable to inland waters. (33 U.S.C.A. 210). The applicability of Rule 18, requiring boats meeting each other on their port sides, is doubtful in this instance because these boats were not approaching each other head-on as they came into view at this bend in the channel. (33 U.S.C.A. 343[a]). Instead, at this point, considering the 90 degree bend in the bayou, the respective headings of the boats might more properly indicate a "crossing" in which the vessel that has the other on its starboard side is required to give way to the other. (Rule 19, 33 U.S.C.A. 344 [a]). In any event it is obvious that the boats were so close to each other when they came into sight travelling at such excessive speeds there was little, if anything, either operator could do to avoid the accident. In addition, Mr. Guilbeau was negligent in operating the motorboat while sitting on its unguarded gunwale in violation of LSA-R.S. 34:850.13. While it is not clear that this last negligence contributed to causing the collision, it does seem clear it contributed to causing Mr. Guilbeau's drowning.
Like Article 2315 of our Civil Code and LSA-R.S. 34:850.1 et seq., Louisiana's "Uniform Pleasure Boating Act", the federal maritime law, and particularly the following statutes, imposes the duty on boat operators to avoid negligence and exercise due care:
"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." (Art. 29, 33 U.S.C.A. 221 )
"No person shall operate any motorboat or any vessel in a reckless or negligent manner so as to endanger the life, limb, or property of any person." (Motorboat Act of 1940, 46 U.S.C.A. 526l)
For these reasons we have concluded, as did the trial judge, that both operators failed to exercise due care under the existing circumstances and were guilty of negligence that constituted proximate causes of the accident.
According to the jurisprudence at the time this suit was tried and decided in the lower court, the maritime law provided no recovery for wrongful death occurring in inland waters. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886); The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959). However, when death resulted from a maritime tort committed on navigable waters within a state *109 having a wrongful death act recovery was allowed under the state statute if the conduct of the parties, measured by the substantive standards of the law of the state, gave rise thereto. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960). Where contributory negligence barred recovery under the substantive law of the state, it was equally applicable as a complete defense in the action for death resulting from a maritime tort. Graham v. A. Lusi, Limited, 206 F.2d 223 (5 Cir. 1953); Hartford Accident & Indemnity Co. v. Gulf Refining Co., 230 F.2d 346 (5 Cir. 1956); Hornsby v. Fishmeal Company, 285 F.Supp. 990 (W.D.La.1968).
Having concluded that both boat operators involved in this case were guilty of negligence that proximately caused the accident, the trial judge correctly held under the then existing jurisprudence that no recovery could be had by the widow and children of the late Andrew Edward Guilbeau, Sr. because of his contributory negligence.
On June 15, 1970, however, the Supreme Court of the United States overruled The Harrisburg, and held "* * * that an action does lie under general maritime law for death caused by violation of maritime duties." Moragne v. States Marine Line, Inc., 398 U.S. 375, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970). As a consequence of Moragne, on August 6, 1970, the United States Court of Appeals, Fifth Circuit, reversed the lower court and concluded in Hornsby, et al. v. Fish Meal Co., et al. 431 F.2d 865 (5 Cir. 1970), that "* * * the traditional admiralty comparative negligence doctrine is applicable * * *" in such death actions.
Briefly stated,
"Contributory negligence is not an absolute defense in admiralty, since the doctrine of comparative negligence prevails. Under this doctrine, contributory negligence only diminishes the amount of recovery. In actions under the Jones Act, it has a specific statutory basis.
* * * * * *
"With regard to the question of division of damages or their distribution in proportion to the degree of negligence, in admiralty cases in which the proportions are not prescribed by statute the cases are not in harmony, although the prevailing view now appears to be that in the case of a `both-to-blame' collision the full burden of the losses sustained by both ships should be shared equally." 2 Am.Jur.2d 833, Admiralty Sec. 187).
Thus, it now seems clear that the judgment of the lower court denying recovery in the wrongful death action because of contributory negligence on the part of the decedent is in error, and this matter must be redetermined on the basis of admiralty principles.
In cases of this type our method of review must correspond to that of the federal appellate courts. Ferdinandtsen v. Delta Marine Drilling Co., 235 So.2d 641 (La.App. 4 Cir. 1970). Since there has been no determination of the amounts of the damages sustained by the widow and children of Andrew E. Guilbeau, Sr. and by Charles Calzada, the case will have to be remanded to the district court for determination of such damages in accordance with admiralty law and rendition of judgment in favor of the parties entitled thereto.
The Supreme Court of the United States refused to decide in Moragne just who is entitled to recover for the death of a decedent under these circumstances. Attention was called to the beneficiaries designated in the Death on the High Seas Act (46 U.S.C. Sec. 761, 762), the Jones Act (46 U.S.C. Sec. 688; 45 U.S.C. Sec. 59), the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. Sec. 909) and also state wrongful death acts (LSA-C.C. Art. 2315). However, as to which schedule should be applied the court said, "* * * we think its final resolution should await further sifting through the *110 lower courts in future litigation." (90 S.Ct. 1792).
Uniformity has always been of paramount importance in admiralty matters. Borrowing the schedule of beneficiaries provided in the Death on the High Seas Act for wrongful death actions under general maritime law will in our opinion more nearly accomplish this objective. We, therefore, conclude that it should be applied in this instance.
The record does not reflect that the passengers in the Guilbeau boat were aware of any incapability on the part of its operator. Being guest passengers, they were not obliged to monitor his operation of the motor boat. And as in Beavers, there was neither time nor opportunity for them to take any action towards eliminating the danger after the appearance of the Calzada boat. Consequently, none of the passengers, except Kenneth Guilbeau were negligent, and they are entitled to recover from the defendant the damages which arose from the personal injuries they sustained in this accident.
Kenneth Guilbeau, however, was lying on the deck of the bow of his father's boat, which had no guard or railing, and was thrown into the water by the collision. LSA-R.S. 34:850.13 prohibits a motor boat operator from allowing any person to ride or sit on the decking over the bow of such vessel while underway unless it is provided with adequate guards or railing to prevent passengers from being lost overboard. Although the penalty is imposed on the boat operator by this criminal statute, it is rather obvious that a passenger who is an accessory to such violation also fails to exercise due care and is negligent under the circumstances. None of the other passengers were thrown out of the Guilbeau boat, and from all indications Kenneth Guilbeau would not have experienced such fate had he not been lying on the deck. Consequently, we conclude that he was guilty of contributory negligence that proximately caused his injuries. Under the applicable doctrine of comparative negligence this diminishes the amount of his recovery. Therefore, upon remand the lower court will have to decide the extent to which Kenneth Guilbeau's negligence contributed to cause his damages and redetermine his reward under admiralty law.
In regard to appellee's contention that all awards were excessive, a trial judge has considerable discretion in matters of quantum. From our review of the record we cannot say that he was clearly erroneous in his assessment of the damages sustained by any of the guest passengers as a result of their respective personal injuries. However, as stated above, the amount to which Kenneth Guilbeau is entitled to recover must be redetermined on remand.
For the foregoing reasons, the judgment of the lower court is affirmed insofar as the awards to Gloria Guilbeau, individually and as the natural tutrix of Van Guilbeau, and to Betty Broussard Guilbeau, for damages resulting from their respective personal injuries are concerned. In all other respects it is set aside and the case is remanded to the lower court for such further proceedings as are necessary to determine the damages sustained by the surviving beneficiaries of the late Andrew E. Guilbeau, Sr. and by Charles Calzada and the amounts of the awards to which such parties and Kenneth Guilbeau are entitled under admiralty law. The costs of court including this appeal, are assessed to the appellee.
Affirmed in part; set aside in part and remanded.

ON APPLICATION FOR REHEARING
PER CURIAM.
On appellee's application for rehearing, we are persuaded that casting appellee for costs of this appeal was inappropriate under all the circumstances. Accordingly our *111 decree is amended to provide that each party shall bear his own costs of this appeal.
We believe our opinion and decree to be correct otherwise, and the application for rehearing is therefore denied.
Rehearing denied.